# United States Court of Appeals
## For the First Circuit

No. 12-2002

GLADYS GARCÍA-RUBIERA ET AL.,

Plaintiffs, Appellants,

v.

LUIS G. FORTUÑO, Governor of Puerto Rico;
JUAN CARLOS PUIG-MORALES, Treasury Secretary,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Gustavo A. Gelpí, U.S. District Judge]

Before

Lynch, Chief Judge,
Torruella and Kayatta, Circuit Judges.

Antonio J. Amadeo-Murga for appellants.
Susana I. Peñagarícano-Brown, Assistant Solicitor
General, Department of Justice, for appellees.

August 16, 2013

**KAYATTA, Circuit Judge.** As this court has detailed in prior opinions, Puerto Rico law has operated since 1995 in a manner that effectively causes hundreds of thousands of motor vehicle owners to pay twice for liability insurance, once through a Commonwealth-run plan, and once in the private market. García-Rubiera v. Calderon ("García-Rubiera I"), 570 F.3d 443 (1st Cir. 2009); García-Rubiera v. Fortuño ("García-Rubiera II"), 665 F.3d 261 (1st Cir. 2011). Under this more-or-less duplicate premium regime, Commonwealth law declared motor vehicle owners to be entitled to a refund of the excess premiums paid. P.R. Laws Ann. tit. 26, §§ 8051, 8055(n). The procedures for seeking such refunds, however, were complicated, varied, and, most importantly, bereft of any meaningful notice; so much so as to be, in effect, hidden. See García-Rubiera II, 665 F.3d at 273 (no notice mailed, nothing posted online, no posting in any readily available publication, and no writing subject to easy discovery even by those who go in person to the pertinent government office). Large amounts of unclaimed refunds accumulated. Beginning in 2002, every two years the Commonwealth placed the unclaimed refunds with its Treasury Secretary to be held "in trust," with the proviso that, if not claimed within five years, the funds escheated to the Commonwealth without notice to the owners of the funds.

In García-Rubiera I, this court held that vehicle owners who paid twice for private and Commonwealth-issued insurance

possess a constitutionally protected property interest in those duplicate premiums. 570 F.3d at 452, 257. In García-Rubiera II, we concluded that the Commonwealth's failure to notify affected vehicle owners of their reimbursement rights amounted to a violation of the procedural due process guarantees of the Fifth and Fourteenth Amendments. 665 F.3d at 274-76. We held that "under these conditions the Commonwealth is required to give individual notice to insureds owed reimbursement to the maximum extent feasible," and we instructed the district court to resolve factual issues as to "feasibility" on remand. Id. at 276. We also held that "the Commonwealth must publish Procedure 96, in full, online and in other places readily accessible by the public." Id. at 277.

On remand, the district court ordered the Commonwealth to notify individual vehicle owners of their reimbursement rights, to publish information regarding the reimbursement procedure in two newspapers, and to allow at least 120 days for vehicle owners to claim the reimbursements to which they are entitled. The district court's order represents a marked improvement of the status quo. Even so, the relief ordered by the district court fails to satisfy the minimum requirements of procedural due process under the Fifth and Fourteenth Amendments. The Commonwealth has in its possession vehicle-specific information without which many insured owners will not be able to obtain the reimbursements to which they are entitled, yet the district court's order does not require the

-3-

Commonwealth to release this information to vehicle owners. Moreover, although the district court's order only provides for a 120-day grace period in which vehicle owners can claim reimbursement before their premium payments escheat to the Commonwealth, the Commonwealth's counsel conceded at oral argument that a one-year grace period would be more appropriate in this context. And while the district court ordered the Commonwealth to publish two notices--one in an English-language newspaper and one in a Spanish-language newspaper--alerting vehicle owners of their reimbursement rights, the district court did not engage in the required balancing analysis to determine whether one-time notice in two newspapers is sufficient to satisfy the Commonwealth's constitutional obligations.

Accordingly, we will remand this case to the district court once again, this time to allow it to craft with the benefit of further guidance an injunction that more fittingly remedies the Commonwealth's constitutional violations. In the meantime, we order that no duplicate premiums shall escheat to the Commonwealth until it has established and complied with a reimbursement procedure which meets the basic requirements of constitutional due process.

Finally, we reverse the district court's denial of plaintiffs' request for an award of interim attorneys' fees. This lawsuit is now entering its twelfth year. Our decision today means

that many more months may elapse before a judgment is final. Throughout this extended period, plaintiffs' attorney has sought to vindicate the constitutional rights of hundreds of thousands of vehicle owners across Puerto Rico. Plaintiffs have already prevailed in this court on the merits of their procedural due process claims. Accordingly, as prevailing parties in a civil rights action, plaintiffs are statutorily entitled to an award of attorney's fees from the Commonwealth. On remand, the district court should make such an award in an amount determined by the court to be sufficient to cover the compensable work performed from the beginning of this action through the date of this opinion.

## I. Background

For a detailed description of the background of this case prior to 2012, we refer the reader to our opinions in García-Rubiera I and II. We note here only that the rulings in those opinions are not subject to reconsideration on this third appeal. United States v. Matthews, 643 F.3d 9, 13 (1st Cir. 2011)("[A] legal decision made at one stage of a criminal or civil proceeding should remain the law of that case throughout the litigation, unless and until the decision is modified or overruled by a higher court" (quoting United States v. Moran, 393 F.3d 1, 7 (1st Cir. 2004))).

On remand following our decision in García-Rubiera II, plaintiffs sought a permanent injunction requiring the

Commonwealth[1] to send individualized notices to all vehicle owners who are entitled to reimbursements. Plaintiffs requested that the notices be sent by certified mail and that each notice state the amount of the refund (including interest) to which the owner is entitled, the license plate and vehicle identification number ("VIN") associated with each vehicle for which a duplicate premium was paid, and basic information regarding the corresponding insurance policy.[2] Plaintiffs also sought to require the Commonwealth to publish a list of the vehicle owners entitled to reimbursement in two daily newspapers of general circulation once a week for two consecutive weeks.

For vehicle owners whose premiums had not yet been transferred from the Asociación Conjunta del Seguro de Responsabilidad Obligatorio ("JUA") to the Treasury Department, plaintiffs' proposed injunction would allow the owners at least 120 days in which to seek reimbursement from the JUA. After the transfer of funds from the JUA to the Treasury Department (and for vehicle owners whose premiums have previously been transferred to

---

[1] Named Defendant Luis G. Fortuño is the former governor of Puerto Rico. Named Defendant Carlos Puig-Morales is the former treasury secretary.

[2] The text of the plaintiffs' proposed injunction refers to "the insurance policy description," without clarifying what specific details should be included in this description. It appears from Plaintiffs' other filings, however, that that they are seeking the name of the insurance company, the policy number, the policy commencement date, and the policy expiration date.

the Treasury), plaintiffs' proposed injunction would allow an additional five-year grace period during which the vehicle owners could file for reimbursement. Plaintiffs sought the appointment of an independent monitor to ensure compliance with the injunction.

Plaintiffs also filed a motion in district court for an award of attorney's fees. The motion sought an interim fee award of $1.5 million and a final award equal to 25 percent of "the common fund and interest created by [plaintiffs' attorney's] efforts." Plaintiffs suggested that the "common fund" should include not only the premium payments that are ultimately reimbursed, but all duplicate premium payments held by the JUA or transferred to the Treasury (apparently without regard to whether these monies are ever claimed by the vehicle owners). Plaintiffs estimated that this fund amounted to more than $180 million before interest--in which case plaintiffs' percentage-of-funds proposal would allow their attorney to recover an award of at least $45 million.

The district court referred the matter of injunctive relief to a magistrate judge, whose report and recommendation the court ultimately adopted with only minor modifications. See García-Rubiera v. Fortuño, 873 F. Supp. 2d 421 (D.P.R. 2012). The district court's permanent injunction required the Commonwealth to compile the names and addresses of all motor vehicle owners who paid a duplicate premium that has not been refunded, and to send

individual notices by mail[3] to all such persons.  Id. at 426.  The district court further ordered that each notice include (1) the fact that the vehicle owner is entitled to a refund; (2) the date that the vehicle owner's premium was or will be transferred to the Treasury; (3) the text of Procedure 96; and (4) the relevant portions of Law 230.[4]  Id.  However, the district court did not require the notices to include the amounts of the refunds, the license plate numbers and VINs associated with each refund, or any information regarding the insurance policies corresponding to each refund.  Id.

The district court also ordered the JUA to publish notice once in an English-language newspaper of general circulation and once in an Spanish-language newspaper of general circulation, and to make the text of Procedure 96 freely available online and at the government offices that collect JUA premiums.  Id.  According to the permanent injunction, the Commonwealth must allow at least 120 days from the time of notice before any additional premiums are

---

[3] The magistrate judge's report and recommendation left to the Commonwealth the decision of whether to mail notice by certified or regular mail.  García-Rubiera, 873 F. Supp. 2d at 427-28.  The district court's injunction simply referred to "mail" and "mailing" and therefore also implicitly left the decision to the Commonwealth.  Plaintiffs have not appealed this portion of the ruling so we do not review it.

[4] As our previous opinions explain in greater detail, Law 230 is the name of the statute enacted on September 11, 2002 and codified at P.R. Laws Ann. tit. 26, § 8055(l) that established the system of transferring unclaimed duplicate premiums to the commonwealth.  García-Rubiera II, 570 F.3d at 449.

transferred from the JUA to the Treasury.  Id.  For premiums that have already been transferred to the Treasury (including those that have already escheated to the Commonwealth), the permanent injunction provided a 120-day grace period during which vehicle owners can file their reimbursement claims.[5]  Id. at 426.  The district court retained jurisdiction over the matter itself but denied plaintiffs' request for an independent monitor.  Id. at 423, 428-29.

With regard to attorney's fees, the district court issued a one-sentence order on July 9, 2012, denying plaintiffs' request that the fee award be calculated on a percentage-of-funds basis. The July 9 order stated that the court would calculate attorney's fees according to the lodestar method, which is based on the number of hours that plaintiff's attorney has devoted to the case and the attorney's hourly rate.  The court entered another one-sentence order on September 19, 2012 denying plaintiffs' motion for interim fees.

Plaintiffs have filed timely appeals from the district court's permanent injunction order and from the court's order regarding interim attorney's fees.  We have jurisdiction under 28

---

[5] Law 230 already provides for a five-year waiting period between the time that premiums are transferred from the JUA to the Treasury and the time that those funds escheat to the Commonwealth. P.R. Laws tit. 26 § 8055(l).  The permanent injunction would not narrow that five-year window; the 120-day grace period would only apply to funds that have already escheated to the Commonwealth or that are scheduled to escheat within four months of the order.

U.S.C. § 1292(a)(1).  <u>See, e.g.</u>, <u>United States</u> v. <u>Mass. Mar. Acad.</u>, 762 F.2d 142, 147 (1st Cir. 1985); <u>see also</u> <u>Marathon Oil Co.</u> v. <u>United States</u>, 807 F.2d 759, 763-764 (9th Cir. 1986).

## II.  Analysis

On appeal, plaintiffs argue that the injunctive relief ordered by the district court is not sufficient to remedy the Commonwealth's constitutional violations.  Plaintiffs also argue that the district court abused its discretion by denying their motion for interim attorney's fees and by refusing to announce that it would follow the percentage-of-funds approach in calculating the ultimate fee award.  After setting out the common standard of review that governs both the injunctive-relief and attorney's-fee elements of the appeal, we consider these arguments in turn.

## A.  Standard of review

Our cases recognize that a district court is "in the best position to tailor the scope of injunctive relief to the its factual findings"; accordingly, our review of the terms of an injunction is for abuse of discretion only.  <u>Vaqueria Tres Monjitas, Inc.</u> v. <u>Irizarry</u>, 587 F.3d 464, 487 (1st Cir. 2009); <u>see also</u> <u>Hiller Cranberry Prods., Inc.</u> v. <u>Koplovsky</u>, 165 F.3d 1, 4 (1st Cir. 1999).  We apply the same abuse-of-discretion standard when reviewing a district court's calculation of attorney's fees.  <u>Pearson</u> v. <u>Fair</u>, 980 F.2d 37, 44 (1st Cir. 1992).  When applying the abuse-of-discretion standard, we review the district court's

underlying factual findings for clear error and its legal conclusions de novo. Global NAPS, Inc. v. Verizon New Eng., Inc., 706 F.3d 8, 12 (1st Cir. 2013). A mistake of law embedded in an injunction or a fee award always constitutes an abuse of discretion. In re Volkswagen & Audi Warranty Extension Litig., 692 F.3d 4, 13 (1st Cir. 2012).

**B.    Challenges to the scope and substance of the injunctive remedy**

Plaintiffs raise five distinct objections to the district court's permanent injunction order. First, they argue that the class should have been expanded to encompass vehicle owners who double-paid for insurance in the years 2008 to 2012. Second, they argue that vehicle owners whose premiums have already been transferred from the JUA to the Treasury should have five years within which to file for reimbursement, rather than the greater of 120 days or five years minus the amount of time that has run from the transfer, as provided by the district court's order. Third, plaintiffs argue that the individual notices mailed to vehicle owners should include the license plate numbers, VINs, and insurance policy numbers corresponding to the class members' duplicate premium payments. Fourth, plaintiffs argue that the permanent injunction's provisions regarding newspaper notice are insufficient to apprise vehicle owners of their reimbursement rights. Fifth, and finally, plaintiffs argue that the district court ought to have appointed an independent monitor to ensure the

Commonwealth's compliance with the permanent injunction. We consider each of these arguments in turn.

## 1. The class definition

Plaintiffs argue that "in the interest of judicial economy," the certified class of unreimbursed vehicle owners who made duplicate premium payments in the 1997-2007 period should be extended to include vehicle owners who are entitled to reimbursement for duplicate premiums paid in the years 2008 to 2012. The parties do not claim that the Commonwealth's conduct changed in any material way during the 2008-2012 period: vehicle owners who acquired or renewed their registrations during the latter timeframe were automatically charged for coverage under the Commonwealth's insurance plan unless they produced proper proof of private insurance, and the Commonwealth failed to post Procedure 96 online or to make it available at the offices where JUA premiums are collected until early 2013. Moreover, the Commonwealth made no apparent effort to inform vehicle owners of their right to reimbursement during the 2008-2012 period.

The Commonwealth asserts that plaintiffs never moved in the district court to expand the class definition (as provided for by Fed. R. Civ. P. 23(c)(1)(C)). To this argument, plaintiffs offer no response. Since we are remanding the case for further consideration anyhow, we therefore leave the question of whether

and how to expand the class definition to the district court on remand.[6]

## 2. The time period within which class members may seek reimbursement

In his report and recommendation to the district court, the magistrate judge emphasized that "the Commonwealth has a valid interest in making a final disposition of the[] funds" that, under Puerto Rico's Law 230, have already escheated to the Commonwealth. García-Rubiera, 873 F. Supp. at 426. Accordingly, the magistrate judge advised that the district court set a 120-day grace period during which vehicle owners whose duplicate premium payments have already escheated to the Commonwealth can submit their reimbursement claims. The magistrate judge explained that "[t]he 120-day period is the same length of time plaintiffs suggest for giving notice of a premium transfer from the JUA to the Commonwealth, and should therefore be a reasonable amount of time for insureds to prepare and submit requests for reimbursement." Id. The district court followed this recommendation without adding any reasons of its own for the 120-day deadline. Id. at 421-22.

---

[6] The Commonwealth suggests that we preemptively dispose of this issue on the grounds that an expansion of the class would entail further class notice. This is not so, as the class here is a Rule 23(b)(2) class. See Fed. R. Civ. P. 23(c)(2) ("For any class certified under Rule 23(b)(1) or (b)(2), the court may direct appropriate notice to the class." (emphasis added)); Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2558 (2011) (notice not mandatory for Rule 23(b)(2) class).

Plaintiffs argue that the clock should be reset so that class members have the full five-year grace period they would have enjoyed had notice been given as it should have been given. Although the plaintiffs' argument has a certain logic to it, we are not persuaded that a five-year grace period is required as part of the remedy for the constitutional violation. While Puerto Rico's Law 230 provides for a five-year period, "a failure to implement state law . . . in itself does not violate the Due Process Clause." Hoffman v. City of Warwick, 909 F.2d 608, 621 (1st Cir. 1990).

The aim here is not to restart a statutory grace period that was part of a flawed scheme in which no meaningful notice was given. The aim, rather, is to provide notice and a reasonable opportunity to act on that notice. See United States v. Locke, 471 U.S. 84, 108 (1985) (constitutionally adequate process where legislature "afford[s] those within the statute's reach a reasonable opportunity both to familiarize themselves with the general requirements imposed and to comply with those requirements"); see also Hodel v. Irving, 481 U.S. 704, 729 (1987) (Stevens, J., concurring in the judgment). While five years is certainly far more than is necessary, the Commonwealth has not shown that a 120-day grace period would give vehicle owners whose premiums have been transferred to the Treasury a "reasonable opportunity" to avoid the escheat of those funds. As noted above, a vehicle owner submitting a reimbursement claim under Procedure 96

-14-

must, inter alia, obtain a certification from her private insurance company that payment was received and that neither the company nor the consumer has been reimbursed to date.  In some cases, the insurance companies will be asked to certify that payments were received more than one-and-a-half decades ago.

In sum, while we cannot say that due process demands a five year grace period, we cannot find any basis in the record for a finding that a 120-day grace period provides a "reasonable opportunity" for vehicle owners to avoid escheat.  At oral argument, the Commonwealth's counsel said that it was willing to allow all vehicle owners at least one year in which to file for reimbursement.  On remand, the district court should determine whether a grace period of not less than one year from the mailing and publication of notice as proposed by the Commonwealth suffices for due process purposes.  If the district court is persuaded that private insurance companies will be able to respond to certification requests well within that window, then a grace period of no less than one year should be sufficient to give vehicle owners a reasonable opportunity to protect their property interest in unreimbursed funds.  If a one-year grace period does not allow enough time for private insurance companies to process the anticipated certification requests, then the district court in its discretion should fashion an alternative approach that will

-15-

reasonably ensure a reasonable opportunity to avoid loss of the funds.

### 3. The inclusion of information that will put the recipients in a position to seek reimbursement

While the district court ordered the Commonwealth to mail individual notices to vehicle owners who are entitled to reimbursement, notice required by the court only includes: (1) a statement that the owner is entitled to a refund; (2) the date of the transfer of the premium from the JUA to the Treasury; (3) the text of Procedure 96; and (4) the provisions of Law 230 regarding escheat. 873 F. Supp. 2d at 422. In this respect, the district court adopted the Commonwealth's proposal. The magistrate judge's report explained that the Commonwealth's proposal "tracks" the notice described in García-Rubiera II and that the plaintiffs have not demonstrated that the Commonwealth can "readily correlate" additional information--such as the license plate numbers, VINs, and insurance policy numbers corresponding to the duplicate premium payments--so that those details can be included in the individual mailings. Id. at 427. According to the magistrate judge's report, "[w]hile defendants could show good faith by collecting and sending this additional information, due process does not require it." Id.

The requirements of due process are not satisfied, however, "if the notifying party knew or had reason to know that notice would be ineffective." Gates v. City of Chi., 623 F.3d 389, 403 (7th Cir. 2010). As the Supreme Court stated in Locke, the

-16-

Constitution requires not just notice of the requirements to be followed to protect one's property, but "a reasonable opportunity . . . to comply with those requirements." 471 U.S. at 108; see also Greene v. Lindsey, 456 U.S. 444, 451 (1982) ("In determining the constitutionality of a procedure established by the State to provide notice in a particular class of cases, its effect must be judged in the light of its practical application to the affairs of men as they are ordinarily conducted." (internal quotation marks omitted)).

Here, the required notice is in many cases being sent years too late, long after many vehicle owners will have since stopped retaining records or even their vehicles themselves. The notice would only apprise recipients that, at some time between 1997 and 2007, they double-paid for automobile liability insurance. It would not tell the recipients when they double-paid, for which vehicle, or on which insurance policy they double-paid--all information that they will need in order to file for reimbursement. Even vehicle owners who have kept meticulous records of their personal finances for the last one-and-a-half decades would have difficulty determining how exactly they might go about recouping their money.

García-Rubiera II said that notice to vehicle owners "must include notice of the transfer of funds from JUA to the Commonwealth, of Procedure 96, and of Law 230's escheat

-17-

provisions." 665 F.3d at 277. That statement of what the notices certainly need include did not preclude Plaintiffs from establishing that other information was also necessary in order to render the notices effective in providing a meaningful opportunity to comply with the reimbursement requirements. The record makes clear that additional information may in many instances be essential in order to provide recipients with a reasonable opportunity to comply with the refund requirements. In turn, Counsel for the Commonwealth conceded at oral argument that it would be "feasible" to include license plate numbers and VINs in the individual notices to vehicle owners. On remand, the district court should hold the Commonwealth to that concession absent convincing proof that supplying such information, while feasible, would create a burden disproportionate to the benefit created.

As for the plaintiffs' specific argument that the individual notices should include insurance policy numbers as well as license plate numbers and VINs, the Commonwealth continues to assert that this information is not available. Yet in their submissions to the district court and their appendix on appeal, the plaintiffs have included a CD that, they say, contains the names, addresses, VINs, license plate numbers, and insurance policy numbers of the vehicle owners who are entitled to reimbursement. On remand, the district court should determine, first, whether the information is or is not available. To the extent that it is

-18-

available, the district court should weigh the benefit to vehicle owners of receiving the information in their notices against whatever burden the Commonwealth might incur in gathering, organizing, and supplying the information. Cf. Greene, 406 U.S. at 451. On the one hand, it is difficult to see why information that already exists in useable databases matched to owner names should not be provided. On the other hand, providing remedial notice should not be so costly as to impose too great a burden in light of the benefit conveyed.

## 4. Additional publication notice

On remand from García-Rubiera II, plaintiffs proposed that the Commonwealth be required to publish a list of vehicle owners entitled to reimbursement, along with the text of Procedure 96, in two daily newspapers once a week for two consecutive weeks.[7] Given that sixteen years have passed since the first of the duplicate premium payments, many of the addresses on record with the JUA and the Treasury Department may no longer be accurate, and the publication of newspaper notice in this case is therefore particularly important. In its counterproposal, the Commonwealth sought an order requiring publication in two newspapers of general circulation--one English-language newspaper and one Spanish-

---

[7] Plaintiffs also proposed that the newspaper notices include the amount of the refund to which each vehicle owner is entitled, the license plate number associated with each refund, and the name of the company that issued the corresponding insurance policy. Plaintiffs do not press these arguments on appeal.

language newspaper[8]--but the Commonwealth proposed that publication occur only once in each newspaper (rather than once a week over the course of consecutive weeks).  The magistrate judge recommended that the district court follow the Commonwealth's counterproposal, and the court adopted the magistrate judge's report.  873 F. Supp. 2d at 422-23, 428.

The question on appeal is whether the Commonwealth's counterproposal for one-time publication in two newspapers--one English, one Spanish--is consistent with the approach that "one desirous of actually informing the [vehicle owners] might reasonably adopt."  Mullane v. Cent. Hannover Bank & Trust Co., 339 U.S. 306, 315 (1950).  We note "the impossibility of setting up a rigid formula as to the kind of notice that must be given; notice required will vary with circumstances and conditions."  Walker v. City of Hous., 352 U.S. 112, 115 (1956); accord Jones v. Flowers, 547 U.S. 220, 226 (2006)(quoting Walker).  The number of newspapers

_____

   [8] The Commonwealth's counsel stated at oral argument that plaintiffs are "not interested" in English-language publication notice.  While portions of plaintiffs' brief on appeal might be interpreted this way, we understand plaintiffs to be arguing that the district court ought to have expanded the publication notice requirement to include a second Spanish-language newspaper--not that the district court should drop the English-language publication notice.  While the vast majority of Puerto Ricans are Spanish-speakers, approximately 5 percent of the population speaks only English at home.  See U.S. Census Bureau, Detailed Languages Spoken at Home and Ability To Speak English for the Population 5 Years and Over for the United States: 2006-2008 tbl. 41 (Apr. 2010), available at http://www.census.gov/hhes/socdemo/language. Publication notice in an English-language newspaper is a reasonable step in reaching this portion of the population.

and the frequency of publication are not necessarily determinative. Ultimately, "assessing the adequacy of a particular form of notice requires balancing the 'interest of the State' against 'the individual interest sought to be protected by the [Due Process Clauses].'" Jones, 547 U.S. at 229 (quoting Mullane, 339 U.S. at 314).

As a general rule, an appellate court will "leave the question of what constitutes sufficient notice primarily to the district court's discretion and apply a deferential standard of review." People of State of Ill. ex rel. Hartigan v. Peters, 871 F.2d 1336, 1340 (7th Cir. 1989). Here, however, we have difficulty discerning the basis for the district court's decision to adopt the Commonwealth's counterproposal rather than the plaintiffs' suggestion. The only explanation offered for ordering one-time notice--rather than notice over the course of consecutive weeks--was that the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions allow a judgment of forfeiture to be entered after one-time publication of newspaper notice if accompanied by posting on a government website. 873 F. Supp. 2d at 428 (citing Supplemental R. G(4)(a)(iii)). But a judgment of forfeiture is generally entered with respect to personal property under the Supplemental Rules only after an arrest warrant is issued and executed, see Supplemental R. G(3)(b)-(c), and only after notice is sent "to any person who reasonably appears to be a

-21-

potential claimant," id. R. G(4)(b)(I). Thus, the supplemental rule allowing for one-time publication of newspaper notice is typically invoked after the federal government has made significantly greater (and generally more timely) efforts to contact potential claimants than the Commonwealth has made so far.

Two other points counsel against the approach taken by the district court. First, the notice to be provided here is notice aimed at achieving a remedy for a long ago defalcation where, due to the passage of time, publication is likely more necessary than in other situations. Second, the value of the property interests at stake here--perhaps more than $150 million-- makes the costs of repeat publication relatively minor. Rather than relying on the Supplemental Rules, which address a very different set of circumstances, the district court should on remand engage in the balancing exercise that case law requires. See Jones, 547 U.S. at 229; Dusenbery v. United States, 534 U.S. 161, 167-68 (2002); Mullane, 339 U.S. at 314. The district court must weigh the vehicle owners' collective interest in adequate notice of their reimbursement rights against the cost to the Commonwealth of publishing notice in an additional newspaper and repeating the notices over a second consecutive week. When asked how her client would be burdened by the plaintiffs' proposal, Commonwealth's counsel cited only "costs," and, while the record does not indicate that the costs of publishing notices in three newspapers over the

-22-

course of consecutive weeks would be substantial in comparison to the amount of unclaimed funds at stake, the Commonwealth will have another opportunity to supplement the record on remand.

Meanwhile, the plaintiffs point out that two newspapers--<u>El Nuevo Día</u> and <u>Primera Hora</u>--dominate the Puerto Rican market. One recent poll suggests that 48 percent of Puerto Ricans read a printed newspaper each day, with 24 percent reading <u>El Nuevo Día</u> and 21 percent reading <u>Primera Hora</u>. Ryan, <u>About Half of Puerto Ricans Read Newspapers Daily</u>, Carribean Bus., Oct. 21, 2010, <u>available at</u> http://cbonlinepr.com/prnt_ed/news02.php?nw_id =4184. If this is more or less correct, it appears that by publishing notice in two Spanish-language newspapers--as well as one English-language newspaper--the Commonwealth can increase the likelihood that information regarding the reimbursement process will reach a broad swath of the Puerto Rican population. On remand, the district court should determine whether the "costs" cited by the Commonwealth are sufficiently burdensome as to outweigh the benefits from a broader reach.

The plaintiffs also argue that the newspaper notices ought to include the text of Treasury Procedure 96. However, it appears to us that the district court's order already accomplishes what the plaintiffs have requested: the order clearly requires that "[i]n publishing . . . notice, defendants shall state . . . the text of Procedure 96." 873 F. Supp. 2d at 422. If any

-23-

ambiguity lingers, the district court will have the opportunity on remand to clarify that the newspaper notices must include the text of Procedure 96 in full (or some meaningful summary of the key points in the text that recipients will need to know).[9]

5. **Plaintiffs' request for appointment of an independent monitor**

Plaintiffs' fifth and final objection to the scope of the permanent injunction is that the district court's order does not provide for an independent monitor to oversee the Commonwealth's compliance with the injunction's terms. We take plaintiffs to be arguing that the district court should have exercised its discretion under Rule 53 of the Federal Rules of Civil Procedure to appoint a "special master" to oversee implementation of the injunction (although plaintiffs do not cite Rule 53 or any other provision in support of their argument). Rule 53 of the Federal Rules of Civil Procedure allows for the appointment of a master only where a statute provides for it, "some exceptional condition" is present, the master is needed "to perform an accounting or resolve a difficult computation of damages," or the district court

---

[9] The procedure is twelve short paragraphs in length, and it includes important information such as the address to which reimbursement claims should be sent, the documents that vehicle owners must attach to their claims, and the length of time that vehicle owners can expect to wait between submission of their reimbursement claims and receipt of payment from the Commonwealth. While the Commonwealth submitted an unsworn declaration after oral argument averring that this information is now available online, the district court has not found that all or almost all class members are internet users.

-24-

cannot "effectively and timely" address pretrial or post-trial matters. Fed. R. Civ. P. 53(a)(1). Yet, plaintiffs do not cite any statute that provides for the appointment of a master here; they do not explain why this case is "exceptional"; the only forms of relief requested at this stage of the litigation are declaratory and injunctive; and the district court is capable of proceeding forward in a timely and effective manner. Even assuming arguendo that Rule 53 would have nevertheless permitted the appointment of a special master here, the district court certainly did not abuse its discretion in deciding not to do so.

## C.   Award and calculation of interim attorneys' fees

Apart from their challenge to the scope of the permanent injunction, plaintiffs also argue that the district court erred by (1) denying plaintiffs' request for an interim fee award and (2) refusing to apply the percentage-of-funds method in calculating attorney's fees. We agree that an interim award is required here, but we see no error in refusing to employ a percentage-of-funds approach in setting the amount of fees.

### 1.   The award of interim fees

Plaintiffs asked the district court for an interim award of attorney's fees. In a single-sentence order, the court explained that it was denying plaintiffs' motion "without prejudice given the pending appeal." This cursory explanation does not satisfy our requirement that district courts adequately explain

their fee decisions.  See T-Peg, Inc. v. Vt. Timber Works, Inc.,
669 F.3d 59, 63 (1st Cir. 2012); Janney Montgomery Scott LLC v.
Tobin, 571 F.3d 162, 166 (1st Cir. 2009).

It is black-letter law that the pendency of an appeal
does not operate as an absolute barrier to an interim fee award
under § 1988 when a party "has established his entitlement to some
relief on the merits of his claims."  Hanrahan v. Hampton, 446 U.S.
754, 757 (1980); see also Hutchinson ex rel. Julien v. Patrick, 636
F.3d 1, 12 (1st Cir. 2011); Coal. for Basic Human Needs v. King,
691 F.2d 597, 602 (1st Cir. 1982).  The present case is precisely
the sort of litigation in which an award of interim fees is called
for.  The plaintiffs "prevailed on an important matter," Hannarah,
446 U.S. at 757, when--in García-Rubiera II--we ruled that the
Commonwealth had violated the procedural due process rights of
hundreds of thousands of vehicle owners across Puerto Rico.  That
ruling is no longer subject to revision by the district court (or
by this panel, for that matter).  Plaintiffs' "substantial right,"
Hannarah, 446 U.S. at 757, to adequate notice has been
recognized--although their relief has yet to arrive.

The Commonwealth argues against an award of interim
attorney's fees on the ground that plaintiffs are somehow at fault
for the delay in arriving at a final judgment:  "If not for the
appeal filed by Plaintiffs challenging the limited injunctive
relief," the Commonwealth contends, there is "no reason why" the

case could not have come to an end by now. This argument actually underscores the importance of allowing interim fee awards in cases like this: counsel entitled to a fee for success already finally achieved should not be told that payment will be delayed unless they forgo additional vindication of their client's rights on appeal (as here).

The Ninth Circuit confronted a similar situation in Taylor v. Westly ("Taylor III") and it reached a similar result. 525 F.3d 1288 (9th Cir. 2008). There, shareholders whose stock had escheated to the State of California sued to get their property back; on a second appeal to the Ninth Circuit, an appellate panel unanimously found that the state had failed to provide the shareholders with constitutionally adequate notice of their rights. See Taylor v. Westly ("Taylor I"), 402 F.3d 924, 925-29 (9th Cir. 2005) (factual background); Taylor v. Westly ("Taylor II"), 488 F.3d 1197, 1201 (9th Cir. 2007) (per curiam) (analysis of constitutional claims). After Taylor II, the Taylor plaintiffs sought an interim award of attorney's fees from the state; the district court denied the request; and the Ninth Circuit reversed. Taylor III, 525 F.3d at 1290. While noting that "interim attorney's fees are the exception rather than the rule," the Taylor III court ruled that such fees should be awarded where plaintiffs have prevailed in a "discrete stage" of the case and "the disparity in litigation resources between parties" means that "failure to

-27-

award interim fees would create a considerable risk of starving out plaintiffs with what we have already determined to be good claims." Id.

The Taylor III court's analysis applies with full force here. The district court abused its discretion when it denied plaintiffs' motion for interim attorney's fees due only to the pendency of an appeal, overlooking the fact that plaintiffs had already prevailed on the merits of their procedural due process claims and despite the disparity in litigation resources between the parties. On remand, the district court should make an award of attorney's fees to plaintiffs in an amount determined by the court to be sufficient to cover the compensable work performed from the beginning of this action through the date of this opinion.

### 2. The calculation of fees

Plaintiffs also argue that the district court was wrong to deny their motion that the final fee award be calculated using the percentage-of-funds approach instead of the lodestar method. It is unclear, however, if the district court's order is sufficiently final to give us jurisdiction to address the issue. 28 U.S.C. § 1291. The district court indicated in a one-sentence order that it would eventually use the lodestar method to calculate the total amount of attorneys' fees, but did not attempt to actually determine the amount of fees which should be awarded. In some circumstances, awards of attorneys' fees may be reviewed

before a case has been definitively resolved on the merits. In re Nineteen Appeals Arising Out of San Juan Dupont Plaza Hotel Fire Litig., 982 F.2d 603, 610 (1st Cir. 1992). But such review is only permissible where the award "definitively resolves claims for attorneys' fees." Id.

A ruling on attorneys' fees is definitive "where a dollar-specific order for attorneys' fees has been entered and further action on the main case will not require revisiting that order." Id. at 609 n.10. The only exception that we are aware of to this general rule is the "peculiar circumstance" where a final amount of attorneys' fees has not been determined but there is "a final judgment on the only issue in which [the appealing party] still had an interest." Boeing Co. v. Van Gemert, 444 U.S. 472, 482 n.7 (1980). Here, in contrast, there remain issues regarding attorneys' fees in which plaintiffs' have an interest and which have not been resolved by the District Court. For example, we have remanded for further consideration of the class definition. The district court's determination of this issue may affect the total amount of fees awarded. Even if we determined definitively that we had jurisdiction to review the district court's order on the choice of fee-award mechanism, we would decline to exercise it in order to give the district court an opportunity to explain its reasoning more fully after resolving the other issues before it on remand.

Our order that the district court make an interim award of attorneys' fees, however, itself raises the question of how to calculate the amount of such a fee award. That question, in turn, may require the court to anticipate how it would calculate a final award so as to ensure that interim and final awards can be reconciled. We therefore offer the following guidance for remand.

A district court can hardly go wrong in selecting the so-called lodestar method when called upon to determine how much of an attorneys' fee a losing defendant need pay a prevailing plaintiff. Perdue v. Kenny A. ex rel. Winn, 130 S.Ct. 1662, 1673 (2010); Coutin v. Young & Rubicam P.R. Inc., 124 F.3d 331, 337 (1st Cir. 1997). Plaintiffs nevertheless argue that the district court in this case can and should base either the interim or final fee award on a percentage-of-funds approach. This approach "appl[ies] only where attorneys seek compensation from a discernable pot of money won by the plaintiffs." In re Volkswagen & Audi Warranty Extension Litig., 692 F.3d 4, 16 (1st Cir. 2012). Where this approach is applicable, a court may compensate Plaintiffs' counsel by awarding them a percentage of the pot of money recovered for the plaintiffs. Id. Plaintiffs suggest they should receive a percentage of the total funds that escheated to the Commonwealth. Amounts not refunded to class members following due notice, however, will belong to the Commonwealth, providing neither a direct nor indirect

benefit to class members.  Therefore, they will not be part of any common fund of which Plaintiffs' counsel might claim a percentage.[10]

A percentage-of-funds approach based on the amount of funds refunded, while better justified in theory, is unworkable in this case.  The district court cannot know the approximate amount of refunds made until after the refunds have been paid out over a period of years.  Hence, it is not possible to know what percentage award would generate what total amount.  If few refunds are claimed, a 30 percent award could be too little.  Yet if most refunds are claimed, 10 percent could be too much.  And once one knows after the fact how much has been paid out, there will remain no pot of money not due the Commonwealth out of which counsel might receive a percentage.  In such a situation we know of no precedent requiring the use of any method other than the lodestar method.

### III.  CONCLUSION

In conclusion, the district court's permanent injunction is <u>vacated</u>; and the court's order denying plaintiffs' motion for an interim award of attorney's fees is <u>reversed</u>.  We <u>order</u> that no duplicate premiums shall escheat to the Commonwealth until it has established and complied with a reimbursement procedure which meets

---

[10] <u>Boeing</u> is not to the contrary.  The final judgment in <u>Boeing</u> was for a sum certain, with pro rata shares to be claimed by class members merely upon request and proof of identity.  444 U.S. at 479.  Here, the judgment is in the form of injunctive and declarative relief, making clear that the Commonwealth will have to pay only what is properly claimed.  <u>See</u> <u>id.</u> at 479 n.5.

the basic requirements of constitutional due process.  Costs are awarded to the Plaintiffs.  We remand to the district court for further proceedings consistent with this opinion.